1

2

3

4

UNITED STATES DISTRICT COURT

5

DISTRICT OF NEVADA

6

ALFRED GRAY,                                                      Case No. 3:14-cv-00593-MMD-WGC

7
                                          Plaintiff,    **REPORT & RECOMMENDATION OF**
                                                        **U.S. MAGISTRATE JUDGE**
8
         v.

9

COMMISSIONER OF SOCIAL SECURITY,

10
                                          Defendant.

11

12          This Report and Recommendation is made to the Honorable Miranda M. Du, United

13   States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to

14   28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4. Plaintiff has filed a

15   document titled "Response to Social Security," which the court construes as a motion to reverse

16   or remand the Social Security Administration's decision finding him not to be disabled. (ECF

17   No. 12.)[1] The Commissioner filed a Cross-Motion to Affirm. (ECF No. 15.) Plaintiff filed a

18   response to the cross-motion. (ECF No. 16.)

19          After a thorough review, and as will be explained in full below, the court recommends

20   that Plaintiff's motion be granted, and that the matter be remanded to the Administrative Law

21   Judge (ALJ) for further proceedings, insofar as the ALJ entirely failed to discuss medical

22   evidence from Plaintiff's treatment providers from February through May of 2014. The court

23   further recommends that the Commissioner's cross-motion to affirm be denied.

**I. BACKGROUND**

24

25          On April 24, 2012, Plaintiff filed applications for Supplemental Security Income (SSI)

26   and Disability Insurance Benefits (DIB). (Administrative Record (AR) 225-234.) The

27   applications were denied initially and on reconsideration. (AR 108-122.) Plaintiff requested a

28

---

[1] Refers to the court's Electronic Case Filing number.

1    hearing before an ALJ. (AR 127-129.) On April 8, 2014, Plaintiff appeared, representing

2    himself, for a hearing before ALJ Eileen Burlison. (AR 26-53.) Plaintiff testified on his own

3    behalf. (AR 28-44, 48-52.) The ALJ also heard testimony from a vocational expert (VE). (AR

4    44-48.) Additional medical evidence was received subsequent to the hearing, which was

5    incorporated into the record. (AR 10.) On June 6, 2014, the ALJ issued a decision finding

6    Plaintiff not disabled. (AR 7-18.) Plaintiff requested review by the Appeals Council, and the

7    Appeals Council denied review, making the ALJ's decision the final decision of the

8    Commissioner. (AR 1-6.)

9          Plaintiff now appeals the decision to the district court. Plaintiff asserts various arguments

10   as to why he believes the ALJ's decision was improper, each of which will be discussed below.

11   The Commissioner responds to each of these arguments, and contends that the ALJ's decision is

12   supported by substantial evidence and should be affirmed.

13                                    **II. STANDARD OF REVIEW**

14   **A. Substantial Evidence**

15          The court must affirm the ALJ's determination if it is based on proper legal standards and

16   the findings are supported by substantial evidence in the record. *Gutierrez v. Comm'r Soc. Sec.*

17   *Admin.*, 740 F.3d 519, 522 (9th Cir. 2014) (citing 42 U.S.C. § 405(g)). "Substantial evidence is

18   'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a

19   reasonable mind might accept as adequate to support a conclusion.'" *Gutierrez*, 740 F.3d at 523-

20   24 (quoting *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012)).

21          To determine whether substantial evidence exists, the court must look at the record as a

22   whole, considering both evidence that supports and undermines the ALJ's decision. *Gutierrez*,

23   740 F.3d at 524 (citing *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001)). The court "'may

24   not affirm simply by isolating a specific quantum of supporting evidence.'" *Garrison v. Colvin*,

25   759F.3d 995, 1009 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035

26   (9th Cir. 2007)). "'The ALJ is responsible for determining credibility, resolving conflicts in

27   medical testimony, and for resolving ambiguities.'" *Id*. (quoting *Andrews v. Shalala*, 53 F.3d

28   1035, 1039 (9th Cir. 1995)). "If the evidence can reasonably support either affirming or

1   reversing, 'the reviewing court may not substitute its judgment' for that of the Commissioner."

2   *Gutierrez*, 740 F.3d at 524 (quoting *Reddick v. Chater*, 157 F.3d 715, 720-21 (9th Cir. 1996)).

3   That being said, "a decision supported by substantial evidence will still be set aside if the ALJ

4   did not apply proper legal standards." *Id*. (citing *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d

5   1219, 1222 (9th Cir. 2009); *Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003)). In

6   addition, the court will "review only the reasons provided by the ALJ in the disability

7   determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison*,

8   759 F.3d at 1010 (citing *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)).

9   **B. Five-Step Evaluation Process of Disability**

10        Under the Social Security Act, "disability" is the inability to engage "in any substantial

11   gainful activity by reason of any medically determinable physical or mental impairment which

12   can be expected to result in death or which has lasted or can be expected to last for a continuous

13   period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). A claimant "shall be determined

14   to be under a disability only if his physical or mental impairment or impairments are of such

15   severity that he is not only unable to do his previous work but cannot, considering his age,

16   education, and work experience, engage in any other kind of substantial gainful work which

17   exists in the national economy, regardless of whether such work exists in the immediate area in

18   which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if

19   he applied for work." 42 U.S.C. §  1382c(a)(3)(b).

20        The Commissioner has established a five-step sequential process for determining whether

21   a person is disabled. 20 C.F.R. § 404.1520 and § 416.920; *see also Bowen v. Yuckert*, 482 U.S.

22   137, 140-41 (1987).In the first step, the Commissioner determines whether the claimant is

23   engaged in "substantial gainful activity"; if so, a finding of nondisability is made and the claim is

24   denied. 20 C.F.R. §  404.1520(a)(4)(i), (b); §  416.920(a)(4)(i); *Yuckert*, 482 U.S. at 140. If the

25   claimant is not engaged in substantial gainful activity, the Commissioner proceeds to step two.

26        The second step requires the Commissioner to determine whether the claimant's

27   impairment or combination of impairments are "severe." 20 C.F.R. § 404.1520(a)(4)(ii), (c) and

28

- 3 -

1    § 416.920(a)(4)(ii); *Yuckert*, 482 U.S. at 140-41. An impairment is severe if it significantly limits

2    the claimant's physical or mental ability to do basic work activities. *Id*.

3         In the third step, the Commissioner looks at a number of specific impairments listed in

4    20 C.F.R. Part 404, Subpart P, Appendix 1 (Listed Impairments) and determines whether the

5    impairment meets or is the equivalent of one of the Listed Impairments. 20 C.F.R.

6    § 404.1520(a)(4)(iii), (d) and §  416.920(a)(4)(iii), (c). The Commissioner presumes the Listed

7    Impairments are severe enough to preclude any gainful activity, regardless of age, education, or

8    work experience. 20 C.F.R. §  404.1525(a). If the claimant's impairment meets or equals one of

9    the Listed Impairments, and is of sufficient duration, the claimant is conclusively presumed

10    disabled. 20 C.F.R. §  404.1520(a)(4)(iii), (d), §  416.920(d). If the claimant's impairment is

11    severe, but does not meet or equal one of the Listed Impairments, the Commissioner proceeds to

12    step four. *Yuckert*, 482 U.S. at 141.

13         At step four, the Commissioner determines whether the claimant can still perform "past

14    relevant work." 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f) and § 416.920(a)(4)(iv), (e), (f). Past

15    relevant work is that which a claimant performed in the last fifteen years, which lasted long

16    enough for him or her to learn to do it, and was substantial gainful activity. 20 C.F.R.

17    § 404.1565(a) and § 416.920(b)(1).

18         In making this determination, the Commissioner assesses the claimant's residual

19    functional capacity (RFC) and the physical and mental demands of the work previously

20    performed. *See id.;* 20 C.F.R. § 404.1520(a)(4); *see also Berry v. Astrue*, 622 F.3d 1228, 1231

21    (9th Cir. 2010). RFC is what the claimant can still do despite his or her limitations. 20 C.F.R.

22    § 1545 and § 416.945. In determining RFC, the Commissioner must assess all evidence,

23    including the claimant's and others' descriptions of limitation, and medical reports, to determine

24    what capacity the claimant has for work despite the impairments. 20 C.F.R. § 404.1545(a) and

25    § 416.945(a)(3).

26         A claimant can return to previous work if he or she can perform the "actual functional

27    demands and job duties of a particular past relevant job" or "[t]he functional demands and job

28    duties of the [past] occupation as generally required by employers throughout the national

1    economy." *Pinto v. Massanari*, 249 F.3d 840, 845 (9th Cir. 2001) (internal quotation marks and

2    citation omitted).

3           If the claimant can still do past relevant work, then he or she is not disabled for purposes

4    of the Act. 20 C.F.R. § 404.1520(f) and § 416.920(f); *see also Berry*, 62 F.3d at 131 ("Generally,

5    a claimant who is physically and mentally capable of performing past relevant work is not

6    disabled, whether or not he could actually obtain employment.").

7           If, however, the claimant cannot perform past relevant work, the burden shifts to the

8    Commissioner to establish at step five that the claimant can perform work available in the

9    national economy. 20 C.F.R. § 404.1520(e) and § 416.290(e); *see also Yuckert*, 482 U.S. at 141-

10   42, 144. This means "work which exists in significant numbers either in the region where such

11   individual lives or in several regions of the country." *Gutierrez*, 740 F.3d at 528. If the claimant

12   cannot do the work he or she did in the past, the Commissioner must consider the claimant's

13   RFC, age, education, and past work experience to determine whether the claimant can do other

14   work. *Yuckert*, 482 U.S. at 141-42. The Commissioner may meet this burden either through the

15   testimony of a vocational expert or by reference to the Grids. *Tackett v. Apfel*, 180 F.3d 1094,

16   1100 (9th Cir. 1999).[2]

17          If at step five the Commissioner establishes that the claimant can do other work which

18   exists in the national economy, then he or she is not disabled. 20 C.F.R. § 404.1566. Conversely,

19   if the Commissioner determines the claimant unable to adjust to any other work, the claimant

20   will be found disabled. 20 C.F.R. § 404.1520(g); *see also Lockwood*, 616 F.3d at 1071;

21   *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009).

22   ///

---

23   [2] "The grids are matrices of the four factors identified by Congress—physical ability, age, education, and work
     experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist in
24   significant numbers in the national economy." *Lockwood v. Comm'r of Soc. Sec. Admin.*, 616 F.3d 1068, 1071 (9th
     Cir. 2010) (internal quotation marks and citation omitted). The Grids place jobs into categories by their physical-
25   exertional requirements, and there are three separate tables, one for each category: sedentary work, light work, and
     medium work. 20 C.F.R. Part 404, Subpart P, Appx. 2, § 200.00. The Grids take administrative notice of the
26   numbers of unskilled jobs that exist throughout the national economy at the various functional levels. *Id*. Each grid
     has various combinations of factors relevant to a claimant's ability to find work, including the claimant's age,
27   education and work experience. *Id*. For each combination of factors, the Grids direct a finding of disabled or not
     disabled based on the number of jobs in the national economy in that category. *Id*.

28

- 5 -

1                                    **III. DISCUSSION**

2       **A. ALJ's Findings in this Case**

3              In the present case, the ALJ applied the five-step sequential evaluation process and found

4       at step one that Plaintiff had not engaged in substantial gainful activity since the alleged onset

5       date of July 2, 2010. (AR 12.)

6              At step two, the ALJ found it was established Plaintiff suffered from the following severe

7       impairments: degenerative disc disease of the lumbar spine and cervical spine. (AR 12.)

8              At step three, the ALJ concluded Plaintiff did not have an impairment or combination of

9       impairments that meet or medically equal the severity of one of the Listed Impairments. (AR 12.)

10             At step four, the ALJ found Plaintiff has the RFC to perform light work as defined in

11      20 C.F.R. § 404.1567(b) and § 416.967(b), with no more than occasional postural movements;

12      no more than frequent overhead reaching with the upper extremities; no more than frequent

13      right-sided fingering; and an avoidance of concentrated exposure to hazards. (AR 13.)

14             In this step, the ALJ recounted Plaintiff's claims of disability based on back problems

15      including arthritis in the lower back, a ruptured lumbar vertebrae, a bulging disc, along with

16      arthritis in the right knee, headaches and heart problems. (AR 13.) He treated his back pain with

17      over the counter medicine. (AR 13.)  He endorsed anxiety attacks two to three times a month.

18      (AR 13.) He reported the following functional limitations: problems lifting, standing, walking,

19      sitting, all postural movements, using his hands, memory, concentration, completing tasks,

20      following instructions and getting along with others. (AR 13.) The ALJ found that while

21      Plaintiff's medically determinable impairments could reasonably be expected to cause the

22      alleged symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting

23      effects of the symptoms were not fully credible. (AR 13.)

24             First, the ALJ stated that the objective medical evidence did not provide strong support

25      for the asserted symptoms and limitations. (AR 13.)

26             Next, the ALJ noted that the medical evidence does not support a medically determinable

27      impairment related to the heart. (AR 14.) A June 2010 stress test was normal. (AR 14.) He went

28      to the emergency room in January 2012 with complaints of chest pain, but chest x-rays and a

1   cardiac workup were normal, while an acute condition of pneumonia/bronchitis was suspected.

2   (AR 14.)

3         With respect to his back, the ALJ said there was a lack of treatment or significant

4   findings within the period at issue from mid-2010 to mid-2012, so SSA requested updated x-rays

5   and a consultative medical examination in September 2012. (AR 14.) X-rays of the lumbar spine

6   revealed degenerative disc disease at L5-S1 but not acute issues; x-rays of the knees were

7   unremarkable. (AR 14.) In the exam, Plaintiff demonstrated no acute distress, no acute

8   cardiac/respiratory issues, no back spasms, inconsistent straight leg raise responses, no

9   significant neurological abnormalities, and a gait with a mild limp. (AR 14.) Based on minimal

10  objective findings and some symptoms of pain magnification, Dr. Steven Gerson concluded

11  Plaintiff was capable of a light exertional level with reduced posturals and precautionary

12  environmental limitations. (AR 14.)

13        Plaintiff went to the emergency room in November 2012, complaining of sudden back

14  pain from lifting a twenty-five pound bag, but the clinical/objective findings were normal. (AR

15  14.) He presented again in February 2013, reporting neck pain from a trip and fall accident, but

16  again clinical findings were unremarkable. (AR 14.) After both of these visits, he was discharged

17  with prescriptions for narcotic medication. (AR 14.) A follow-up CT scan of the neck revealed

18  mild spurs with no acute issues. (AR 14.)

19        Plaintiff's next issue arose in February 2014, when he complained of neck pain and low

20  back pain with radicular symptoms. A(R 14.) Due to a lack of certainty with respect to the

21  clinical observations and diagnoses, imaging studies were recommended. (AR 14.) X-rays and an

22  MRI of the cervical spine in March 2014 again revealed degenerative disc disease with no acute

23  findings and no evidence supportive of a radicular component to Plaintiff's pain. (AR 14.)

24  Lumbar x-rays and an MRI were consistent only with mild degenerative disc disease. (AR 14.)

25        The ALJ concluded that while pain complaints are subjective in nature, the severity of the

26  pain alleged by Plaintiff was completely disproportionate to the objective evidence. (AR 14.)

27  There were no significant findings related to neurological involvement, muscle wasting or

28  muscle atrophy normally associated with pain and inactivity. (AR 14-15.) Imaging studies were

1   consistent with some mild degenerative disc disease with no evidence of nerve root

2   impingement, severe stenosis, progressive neurological deficits, infection, tumors or other acute

3   findings reasonably related to the severity of the pain alleged. (AR 15.)

4        In addition, the ALJ cited the conclusions of the State agency medical consultants who

5   concluded Plaintiff was capable of light work with reduced posturals, frequent overheard

6   reaching, frequent right-sided fingering, and precautionary environmental limitations. (AR 15.)

7   The ALJ accorded these opinions great weight, finding them consistent with the clinical findings

8   and taking into consideration the imaging results. (AR 15.)

9        The ALJ also considered a statement from Plaintiff's sister, a non-medical source. (AR

10  15.) The ALJ accorded little weight to the generalized statements/health history insofar as they

11  seek to assess Plaintiff's current functional limitations because of their inherent subjectivity/bias,

12  lack of medically acceptable standards, vagueness/lack of first-hand observation, and their

13  general inconsistency with the objective medical evidence. (AR 15.)

14       Finally, the ALJ commented that the records do not provide a reasonable basis for finding

15  any greater level of limitations. (AR 15.) The ALJ noted the lack of overall treatment despite

16  access to medical care and little evidence of seeking out free/reduced cost services; conservative

17  treatment modalities of over-the-counter medication with little or no reported side effects; and

18  instances of possible symptom magnification/exaggeration, also rendered Plaintiff's allegations

19  of disabling symptoms and limitations not fully credible. (AR 15.)

20       The ALJ then found that Plaintiff was capable of performing past relevant work as a

21  retail sales manager, retail store manager, and counter supervisor. (AR 15-16.) In making this

22  determination, the ALJ relied on the Dictionary of Occupational Titles (DOT) and the VE's

23  testimony, to find Plaintiff engaged in this work previously. (AR 15-16.) She found that the work

24  was performed within fifteen years of the alleged onset date, and the duration for the positions

25  exceeds the durational requirements of Social Security Ruling 82.62. (AR 16.) In addition,

26  records document substantial gainful activity earnings for the relevant durational time period.

27  (AR 16.) The ALJ posed a hypothetical question to the VE which assumed an individual of

28  Plaintiff's age, education, work experience and RFC, and the VE testified Plaintiff would be able

1    to perform this past relevant work. (AR 16.) The ALJ concluded that the exertional and non-

2    exertional requirements of Plaintiff's past relevant work as a retail sales manager and counter

3    supervisor are consistent with Plaintiff's RFC. (AR 16.) Therefore, the ALJ found Plaintiff not

4    disabled.

5         At step five, the ALJ made an alternative finding that other jobs exist in the national

6    economy that Plaintiff can also perform given his age, education, work experience and RFC.

7    (AR 16-17.) Specifically, the VE testified Plaintiff could perform the requirements of the

8    following jobs: Order Caller (DOT 209.667-014; 15,800 jobs available nationally); Ticket Taker

9    (DOT 344.667-010; 23,400 jobs available nationally); and Collator Operator (DOT 208.685-010;

10   20,000 jobs available nationally). (AR 17.) As a result, the ALJ found Plaintiff was not disabled

11   under step five as well. (AR 17-18.)

12   **B. Issues Raised in Plaintiff's Motion**

13        **1. Audio Recording**

14        First, Plaintiff asks where the audio recording of the hearing is, stating it will show the

15   attitude and rudeness of the ALJ. (ECF No. 12 at 1.) He also says that it will reflect that every

16   time he would try to bring a point to the table about his ability to work, he would be interrupted

17   and told "that is not our concern." (*Id*.)

18        As the Commissioner points out, an audio transcript of the hearing is not prepared by

19   SSA. Instead, as part of the Commissioner's answer to an action seeking review of the ALJ's

20   decision, the Commissioner is required to "file a certified copy of the transcript of the record

21   including the evidence upon which the findings and decision complained of are based." 42

22   U.S.C. § 405(g). The court has reviewed the transcript in full (AR 28-54), and finds that the ALJ

23   at all times conducted herself appropriately and professionally.

24        **2. National Job Numbers**

25        Second, Plaintiff states that he asked the VE how many of the jobs identified were in

26   Nevada, and the ALJ interrupted and said, "That's not our concern, sir. The requirement is that

27   we have national numbers." (ECF No. 12 at 1.) Plaintiff states that he does not live "nationally,"

28

1    and cannot just pick up and move to the job area, and inquires as to who would pay for him to

2    move where these jobs are located nationally. (*Id*.)

3        After finding pursuant to the VE's testimony that Plaintiff could perform his past relevant

4    work, the ALJ asked the VE whether Plaintiff could perform other work available in significant

5    numbers in the national economy. (AR 46.) After the VE identified several jobs Plaintiff was

6    capable of performing, the ALJ asked Plaintiff if there were any limitations he wanted to pose to

7    the VE that he perceived as keeping him from working. (AR 46.) After posing several questions,

8    including one about how much a person assigned to one of those jobs would make, the ALJ

9    explained to Plaintiff that how much money he would make was not the issue. (AR 48-49.)

10   Instead, the SSA is concerned with how many jobs exist in the national environment that

11   Plaintiff is capable of performing. (AR 49.) Plaintiff also asked how many of the jobs identified

12   were in Nevada. (AR 49.) The ALJ responded: "That's not our concern, sir. The requirement, sir,

13   is that we have national numbers." (AR 50.)

14       While the court appreciates Plaintiff's concern that he would not be able to just move to

15   another state for one of these jobs, the ALJ gave Plaintiff a correct statement of the law. Pursuant

16   to the regulations, at step five, the Commissioner has the burden of establishing that the claimant

17   can perform work available in the national economy. 20 C.F.R. § 404.1520(e) and § 416.290(e);

18   *see also Yuckert*, 482 U.S. at 141-42, 144. This means "work which exists in significant numbers

19   either in the region where such individual lives *or* in several regions of the country." *Gutierrez*,

20   740 F.3d at 528 (emphasis added). Therefore, if the work exists in several regions of the country,

21   but not in the region Plaintiff lives, the ALJ may still find Plaintiff not disabled.

22       In sum, the ALJ's response to this question does not serve as a basis for remanding this

23   matter as the ALJ's response was appropriate.

24       **3. Other Evidence**

25       Third, Plaintiff states: "I know that Social Security has pictures of me doing things like

26   DJing and so-on. However, I have not seen them in any of their evidence. So this makes me

27   wonder what else is being withheld." (ECF No. 12 at 2.)

28

1    There is no indication that the ALJ relied on such evidence, or any other "extra-record"

2  evidence in making the non-disabled determination; therefore, whether SSA is in possession of

3  such records or not is immaterial to this action.

4    **4. Discrimination**

5    Fourth, Plaintiff asserts that he feels he was discriminated against because as soon as he

6  said he was representing himself, the feeling in the room changed, and it seemed like he was

7  wasting his time. (ECF No. 12 at 2.)

8    The record reflects that Plaintiff signed a waiver regarding representation, and at the

9  hearing the ALJ confirmed, once again, that he elected to represent himself. (AR 28-29, 215.)

10  The transcript does not reflect any bias toward Plaintiff as a self-represented litigant.

11    **5. Additional Medical Evidence**

12    Fifth, Plaintiff states that he is submitting more medical evidence. (ECF No. 12 at 2.) He

13  states that he had no money or insurance to see doctors, so he went to the emergency room when

14  the pain was too much, where he was given narcotic pain medication which he would only take

15  when in extreme pain. (*Id*.) He later states that the evidence of spinal stenosis, foramina

16  narrowing, and bone spurs are not in the Social Security paper work. (*Id*. at 3.)

17    The court will address this argument below, insofar as it can be construed as asserting

18  that the ALJ failed to consider the additional medical evidence he submitted prior to the ALJ's

19  issuance of the decision in this matter.

20    **6. Social Security Doctors and Imaging**

21    Plaintiff asserts that "there are commercials and talk about Social Security Doctors are

22  there to fight on the side of Social Security." (ECF No. 12 at 3.) He claims that their doctor and

23  the imaging was the only thing used to say he could go back to work. (*Id*.) He claims that he has

24  been dealing with pain for a long time, forcing himself to act like he could do the job no matter

25  how bad he feels. (*Id*.)

26    The court interprets this as an argument that the consultative physicians are somehow

27  biased, but Plaintiff points to no particular bias on their part in this case; nor can the court

28  discern any bias from the record.

1

**7. Severe Impairments**

2    Plaintiff points out that the ALJ admitted his back and neck pain are severe, but did not

3 find him disabled. (ECF No. 12 at 3.) He does not see the logic in this. (*Id*. at 4.)

4    As Plaintiff can see from the court's description of the five-step evaluative process above,

5 the ALJ is required to determine at step two whether a claimant's asserted impairments or

6 combination of impairments are severe; meaning, that they significantly limit the claimant's

7 physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii), (c) and §

8 416.920(a)(4)(ii); *Yuckert*, 482 U.S. at 140-41. A finding that impairment(s) are severe at step

9 two does not necessarily mean a claimant will be found to be disabled. It merely means that the

10 ALJ will move on to steps three, four and possibly five, if necessary. In other words, the ALJ

11 must still determine whether the impairments qualify as one of the Listed Impairments so that the

12 claimant is presumed disabled, and if not, must determine whether the claimant can either

13 perform past relevant work or work available in the national economy to make a disability

14 determination.

15

**8. Plaintiff's Sister's Statement**

16    Plaintiff disputes the ALJ's findings with respect to his sister's statement. (ECF No. 12 at

17 4.) He states that his sister lives across the street from him and sees him every day, and has

18 brought him to appointments, but was unable to attend the hearing with him. (*Id*.)

19    Plaintiff's sister submitted a statement on April 8, 2014. (AR 337-339.) She states

20 Plaintiff "is not able to do much of the usual everyday things, without extreme pain." (AR 337.)

21 She states that over the past few years, Plaintiff's condition has worsened dramatically. (AR

22 337.) He cannot sit or stand for lengthy periods of time, he experiences numbness in some of his

23 extremities, and he cannot lift anything more than a gallon of milk without experiencing pain in

24 his neck or back. (AR 337.) She states that he cannot bend over without extreme pain, and cannot

25 lift without ending up on the floor. (AR 337.)

26    She notes that he is unable to do things such as rake leaves in the yard, fill a dog water

27 bowl, do dishes while leaning over a sink, move things from one spot to another by pushing or

28

1   picking them up. (AR 338.) She indicates he cannot walk to the mailbox without experiencing

2   shooting pains. (AR 338.) He cannot pick up his children. (AR 338.)

3   She concludes by stating that Plaintiff's spine is degenerating, he has arthritis in his back

4   and knee, his arms and legs go numb because of pinching nerves, and in a short amount of time

5   will likely be in a wheelchair. (AR 339.)

6   As indicated above, the ALJ gave the statement little weight because of its inherent

7   subjectivity/bias, lack of medically acceptable standards, vagueness and lack of first-hand

8   observation, and general inconsistency with the objective medical evidence. (AR 15.)

9   An ALJ must take into account lay witness evidence regarding a claimant's symptoms or

10  how impairments affect the claimant's ability to work. *See Ghanim v. Colvin*, 763 F.3d 1154,

11  1165 (9th Cir. 2014) (citation omitted). An ALJ may reject this evidence by giving a reason

12  germane to that witness. *Id*. (citation omitted).

13  Here, the ALJ gave several reasons germane to Plaintiff's sister's statement for assigning

14  the statement little weight. Accordingly, the court cannot conclude that the ALJ erred in this

15  regard.

16  **C. Is the ALJ's Determination Supported by Substantial Evidence?**

17  The court must affirm the ALJ's determination if it is based on proper legal standards and

18  the findings are supported by substantial evidence in the record. *Gutierrez v. Comm'r Soc. Sec.*

19  *Admin.*, 740 F.3d 519, 522 (9th Cir. 2014) (citing 42 U.S.C. § 405(g)).

20  **1. Summary of Medical Evidence**

21  Plaintiff was seen in the emergency department on February 10, 2009, with complaints of

22  low back pain. (AR 354.) He was discharged and prescribed Vicodin and Flexeril. (AR 360-61.)

23  An MRI of Plaintiff's right knee was performed on February 23, 2009, and noted mild

24  arthritic change in the patellofemoral joint with no meniscal or ligamentous injury. (AR 363.) An

25  MRI of the lumbar spine the same day showed a small to moderate disc herniation projecting to

26  the left L5-S1 superimposed on the bulge, but no spinal stenosis or foraminal narrowing. (AR

27  364.) A diffuse bulge at L4-5 was also present. (AR 364.)

28

- 13 -

1    He was seen by Dr. Pietro A. Memmo on April 6, 2009. (AR 390-391.) It was noted that

2    Plaintiff had low back pain due to his underlying degenerative disc disease, and treatment

3    options including medications, physical therapy and epidural injections were discussed. (AR

4    391.) Dr. Memmo recommended an epidural injection, with which Plaintiff concurred. (AR 391.)

5    On April 16, 2009, he received a left L5-S1 intralaminar epidural injection. (AR 389.)

6    Plaintiff was seen for evaluation of low back and left leg pain on February 16, 2010. (AR

7    387-88.) It was noted on examination that his back motion was relatively well preserved, but he

8    did have pain on extremes of flexion and extension. (AR 387.) The straight leg raise was positive

9    on the left and negative on the right. (AR 387.) Motor testing of the lower extremities showed

10    full strength. (AR 387.) Sensation was intact. (AR 387.) The physician, Dr. Arnold J. Rossi, gave

11    the following impression: "I think this man at least in part is symptomatic from his MRI finding.

12    He [h]as failed conservative management and at this point his options are to consider pain

13    management or undergo lumbar discectomy[.]" (AR 388.) This procedure was described to him,

14    and Plaintiff said he would think it over. (AR 388.)

15    Plaintiff was seen on May 13, 2010, for complaints of numbness in his left arm and chest

16    pain (AR 374), but the results of a June 3, 2010 stress echocardiography were normal. (AR 371-

17    72.)

18    On January 25, 2012, Plaintiff was seen with complaints of headache, chest pain, left arm

19    numbness, and tingling. (AR 408-16.) An x-ray was taken of Plaintiff's chest. (AR 405.) There

20    was a suspicion of pneumonia. (AR 405.) A CT of the head was also taken that day and was

21    generally normal. (AR 406.)

22    On September 25, 2012, an x-ray of the lumbar spine was taken which revealed

23    degenerative disc disease at the lower lumbar spine with slight scoliosis, but no acute bony

24    abnormalities. (AR 447.) An x-ray was also taken of the knees, which was unremarkable. (AR

25    448.)

26    On the same date, Plaintiff underwent an independent internal medical evaluation with

27    Dr. Gerson. (AR 450-455.) Plaintiff's chief complaint was back pain, which he claims to have

28    had since he was eighteen years old. (AR 450.) He reported constant low back pain that goes

1    down into the left greater than right leg, with intermittent numbness in the legs. (AR 450.) He

2    experienced the pain when sitting, standing and walking. (AR 450.) He had physical therapy in

3    the past which did not help, and an epidural injection that helped for approximately two weeks

4    before the pain returned. (AR 451.) He mentioned seeing an orthopedic surgeon for his back,

5    who recommended conservative care, no surgery and epidural injections. (AR 451.) He had

6    taken Motrin or Tylenol which gave him mild relief of symptoms and made the pain tolerable.

7    (AR 451.) He also reported chronic right knee pain with swelling, which caused the knee to give

8    out or lock. (AR 451.) Finally, he claimed numbness of the left arm. (AR 451.)

9        On examination, he appeared in no acute distress. (AR 451.) He denied neck pain, and

10   had full range of motion in the neck. (AR 452.) He had full strength in the extremities. (AR 452.)

11   A mild limp was noted, with occasional abnormal posture. (AR 453.)

12       Dr. Gerson noted that Plaintiff could point out various pathologies by moving, waving

13   and rotating both arms and hands in several directions, one time with both arms almost fully

14   overhead, without any obvious pain or distress. (AR 455.) He at times was with pain

15   magnification, reporting pain with the gentlest palpation of the skin over the lumbar

16   paravertebral muscles. (AR 455.) Dr. Gerson also noted that at times Plaintiff's statements were

17   not consistent, and he changed some of his answers. (AR 455.)

18       Dr. Gerson opined: (1) Plaintiff can lift and/or carry twenty-five pounds occasionally, and

19   ten pounds frequently; (2) can sit, stand and/or walk up to six hours in an eight-hour workday;

20   (3) standard breaks and lunch would provide sufficient relief if Plaintiff needs to alternate sitting

21   and standing; (4) he can climb ramps/stairs, ladders/scaffolds, stoop/bend, kneel, crouch, and

22   squat occasionally, can frequently balance, but never crawl; (5) he is limited to frequent reaching

23   above the shoulders and frequent right-hand fingering; (6) he should be restricted to only

24   occasionally exposure to heights or moving machinery. (AR 454-55.)

25       Plaintiff was seen in the emergency room on November 28, 2012, with complaints of

26   chronic back pain. (AR 465-467.) The pertinent labs and imaging studies were reviewed, and

27   Plaintiff indicated he felt improved after being given Dilaudid and Toradol, though his back pain

28

1   did not completely resolve. (AR 467.) He was neurologically intact. (AR 467.) He was placed on

2   Medrol, Percocet, and Flexeril and referred to Dr. Sekhon for spine issues. (AR 467.)

3          He was seen in the emergency room again on February 13, 2013, with complaints of neck

4   pain after tripping in the hall three days prior. (AR 472-475.) He indicated he had chronic low

5   back pain. (AR 472.) His examination was unremarkable. (AR 473-74.) There were no

6   neurological findings relative to his neck pain, and was discharged with cervical sprain

7   precautions. (AR 474.) A CT of the cervical spine showed mild left convex scoliosis and reversal

8   of lorodotic curvature in the cervical spine, with no acute fracture or dislocation, and minimal

9   endplate spurs. (AR 629.)

10          Plaintiff was seen on March 1, 2013, for a follow up regarding his last emergency visit.

11   (AR 497-499.) He was to continue Flexeril and over-the-counter Tylenol. (AR 498.)

12          On February 27, 2014, Plaintiff was seen by Dr. Lali Sekhon's office for a

13   neurosurgery/spine consultation for complaints of neck pain, left arm numbness, low back pain,

14   and left leg pain and numbness. (AR 618-621.) Plaintiff described it as low back pain that

15   radiates into the left leg with attendant numbness. (AR 618.) He did report that he gets some

16   relief with sitting. (AR 618.) The neck pain and left arm numbness started six months prior after

17   a fall, and had been managing the pain with Norco that he received from a dentist. (AR 618-19.)

18   He also was taking Flexeril and ibuprofen, which helped. (AR 619.) On examination his

19   extremities had a normal range of motion, with no instability, and he had a normal gait as well as

20   normal range of motion in the cervical and lumbar spine. (AR 619.) The muscle strength and

21   tone was normal in the arms and legs, and the deep tendon reflexes were likewise normal. (AR

22   620.) Sensation in the arms and legs was normal, except sensation in the left forearm was

23   decreased to pinprick and light touch when compared to the right. (AR 620.) He had positive

24   Tinel's sign on the left with increased numbness in the first through third digits. (AR 620.)

25   Dr. Sekhon advised getting updated imaging studies of the cervical and lumbar spine, as well as

26   an EMG of the left upper extremity. (AR 620.) Dr. Sekhon declined to adjust his medications at

27   that time. (AR 620.)

28

1    On March 11, 2014, images of the cervical spine were taken which revealed no acute

2 findings, and mild degenerative disc disease at C3-4 and C5-6. (AR 598, 636.) An MRI of the

3 cervical spine on the same date revealed minimal to mild cervical spondylotic changes form the

4 C2-3 level through C6-7 level, and mild to moderate multilevel neural foraminal narrowing. (AR

5 600, 631.) Images of the lumbar spine that day which showed trace fixed L5/S1 retrolisthesis

6 where there is some disc height loss, and slight fixed degenerative retrolisthesis at L3/4 with

7 mild disc height loss. (AR 601, 637-38.) An MRI of the lumbar spine showed: mild central canal

8 stenosis at the L4-5 and L5-S1 level secondary to facet arthropathy; mild spondylotic changes at

9 the L4-5 and L5-S1 level; and mild multilevel neural foraminal narrowing. (AR 604.)

10    March 31, 2014, images of the knees revealed mild joint space loss involving lateral

11 patellofemoral compartment of the right knee. (AR 635.)

12    He was seen by Dr. Sekhon again on April 22, 2014. (AR 622-625.) Dr. Sekhon reviewed

13 the x-rays and MRI of the cervical spine and noted spondylosis from C3-4 down to C5-6, and at

14 C5-6 on the left side there is a spur causing lateral recess stenosis. (AR 624.) In the lumbar spine,

15 Dr. Sekhon noted there is a degree of facet arthropathy and degenerative disc disease at L4-5 and

16 L5-S1, with facet arthropathy causing lateral recess stenosis at these levels. (AR 624.)

17    Dr. Sekhon described the lumbar spinal stenosis as mild to moderate, and also mentioned

18 possible left carpal tunnel syndrome. (AR 624.) Dr. Sekhon opined that he did not think there

19 would be a surgical solution for Plaintiff's back pain, but there could possibly be an L4-S1

20 laminectomy to try and improve the leg symptoms and possibly a C5-6 discectomy, but

21 Dr. Sekhon wanted to avoid this. (AR 624.) Dr. Sekhon gave Plaintiff a prescription for Ultram

22 and Mobic; he was set up for pain management; he was to get bilateral L3-4, L4-5, L5-S1

23 radiofrequency ablations and facet joint injections; a splint for his left arm carpal tunnel

24 syndrome; an EMG of the left arm; and a cervical epidural. (AR 624.)

25    Plaintiff was seen by Jeffrey S. Zollinger, D.O., of Nevada Advanced Pain Specialists on

26 May 19, 2014. (AR 626-627.) Nerve conduction studies showed reduced amplitudes in the right

27 median and ulnar sensory nerves, and needle examination showed large, complex motor unit

28

1    potentials in C6 innervated muscles in the left upper limb. (AR 626.) There was

2    electrophysiologic evidence of a chronic C6 radiculopathy in the left upper limb. (AR 626.)

3    **2. Analysis**

4    The ALJ's determination might have been supported by substantial evidence insofar as

5    that evidence consisted of Plaintiff's medical records from 2009 through 2013; however, the ALJ

6    entirely failed to discuss the records from 2014.

7    At the end of his hearing, Plaintiff alerted the ALJ that he had additional appointments

8    scheduled, and the ALJ reminded Plaintiff to make sure the records were submitted for her

9    review. (AR 50-52.)

10    The ALJ's decision does mention that additional medical evidence was received

11    subsequent to the hearing, and states that such evidence was fully considered within the ALJ's

12    decision. (AR 10.)  Such evidence is in fact included in the record (AR 598-604, 618-627, 631,

13    635-638); however, the ALJ makes absolutely no mention in her decision of: the February 27,

14    2014 and April 22, 2014 evaluations by Dr. Sekhon; the March 11 and 31, 2014 imaging studies;

15    or the May 19, 2014 nerve conduction study results from Dr. Zollinger.

16    This is significant because the findings as well as the recommended course of treatment

17    changed somewhat dramatically from prior imaging studies, examinations and treatment

18    protocols. The ALJ failed to discuss the latest imaging results which demonstrate spondylosis

19    from C3-4 down to C5-6, a spur at C5-6 causing lateral recess stenosis in the cervical spine, and

20    facet arthropathy , degenerative disc disease and lateral recess stenosis, as well as mild multi-

21    level foraminal narrowing in the lumbar spine. (AR 598-601, 604, 631, 635-38.) Dr. Sekhon

22    prescribed new medications and recommended bilateral ablations and facet joint injections, a

23    cervical epidural, and additional studies. (AR 624.)

24    Dr. Sekhon also diagnosed a new condition- possible left carpal tunnel syndrome-for

25    which a splint was prescribed. (AR 624.) The ALJ did not mention any of Dr. Sekhon's findings,

26    let alone the diagnosis of possible left carpal tunnel syndrome, which is not discussed as an

27    impairment, and is not covered by the limitations imposed by the assigned  RFC. Nor did the

28

1    ALJ mention the abnormal nerve conduction studies from Dr. Zollinger which evidenced chronic

2    C6 radiculopathy in the left upper limb. (AR 626-27.)

3         In 2015, in *Marsh v. Colvin*, 792 F.3d 1170 (9th Cir. 2015), the Ninth Circuit confirmed

4    that an ALJ errs where he or she does not even mention a treating physician's notes. In that case,

5    the Ninth Circuit held that where there was a complete failure to mention the notes, it could not

6    conclude that the error was harmless. *Id*. at 1173 (citation omitted).

7         Here, the ALJ erred in failing to discuss the medical evidence from 2014. Given the

8    difference between the findings and recommendations contained in these records when compared

9    to prior records, and the ALJ's complete failure to mention these findings, the court cannot

10   conclude that the ALJ's error was harmless. As a result, the court recommends that this matter be

11   remanded to the ALJ for consideration of this evidence.

### IV. RECOMMENDATION

13        **IT IS HEREBY RECOMMENDED** that Plaintiff's motion (ECF No. 12) be

14   **GRANTED**, and that this matter be **REMANDED** to the ALJ for further proceedings, *i.e.*, for

15   consideration of the medical records from Plaintiff's treating physicians from February 2014 to

16   May 2014 that the ALJ failed to discuss.

17        **IT IS HEREBY FURTHER RECOMMENDED** that the Commissioner's cross-motion

18   to affirm (ECF No. 15) be **DENIED**.

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

1          The parties should be aware of the following:

2          1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule IB 3-2 of the Local

3   Rules of Practice, specific written objections to this Report and Recommendation within fourteen

4   days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and

5   Recommendation" and should be accompanied by points and authorities for consideration by the

6   District Court.

7          2. That this Report and Recommendation is not an appealable order and that any notice of

8   appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed

9   until entry of the District Court's judgment.

10

DATED: January 29, 2016.

11

12          _____
            WILLIAM G. COBB
13          UNITED STATES MAGISTRATE JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28